## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SHARIF HASSAN,<br><br><br>                    Plaintiff,<br><br>          -versus-<br><br>CITY OF ATLANTA and ATLANTA POLICE DEPARTMENT OFFICER FRANCESCA BARBER, ID No. 6428 sued in her individual capacity; and JANE/JOHN DOES Nos. 1-2, current or former officers of the Atlanta Police Department sued in their individual capacities,<br><br>                    Defendants. | CIVIL ACTION FILE NO.:<br>1:21-CV-04629-TWT<br><br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT[1]

Plaintiff Sharif Hassan a photojournalist, was arrested for a curfew violation while filming another individual's arrest at a June 1, 2020 political demonstration, even though the City of Atlanta had exempted some other members of the media from the curfew order. Hassan brings this action against Defendants City of Atlanta, Atlanta Police Department ("APD") Officer Francesca Barber, ID No. 6428, and APD Officers Jane/John Does Nos. 1-2, under 42 U.S.C. § 1983; the

---

[1] Defendants do not object to the filing of this First Amended Complaint.

First, Fourth, and Fourteenth Amendments of the United States Constitution; the Privacy Protection Act, 42 U.S.C. § 2000aa, *et seq.*; and Georgia law. Plaintiff seeks declaratory and equitable relief and damages.[2]

## PARTIES

1.      Plaintiff Sharif Hassan ("Plaintiff" or "Hassan") is a United States citizen who is over the age of eighteen. He is a photojournalist.

2.      Defendant City of Atlanta is a municipal corporation created under the laws of the State of Georgia. At all times relevant to this complaint, the City of Atlanta employed then-Mayor Keisha Lance Bottoms; members of the Atlanta City Law Department referenced herein; and APD Officer defendants Francesca Barber, ID No. 6428, and Jane/John Does Nos. 1 and 2.[3]

3.      Defendants Francesca Barber, ID No. 6428, and Jane/John Does Nos. 1 and 2 are current or former employees of the APD sued in their individual capacities who at all times relevant to this complaint acted under color of law.

---

[2] Plaintiff reserves the right to move to amend his pleadings to add additional defendants under a relation-back and tolling argument if discovery identifies additional individuals who would have been timely identified as proper defendants had the City complied with its obligations under the Georgia Open Records Act, O.C.G.A. § 50-18-70, *et seq.*, to respond to Plaintiff's counsel's pre-litigation record requests.

[3] See FN2, supra.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question under 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments of the United States Constitution.

5.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

6.    Upon service of process, this Court acquires personal jurisdiction over the Defendants under Fed. R. Civ. P. 4(k)(1)(a).

7.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.    Venue is proper in the Northern District of Georgia (Atlanta Division) under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this district and Defendants reside within this district.

## STATEMENT OF FACTS

**Plaintiff Hassan is an Arab-American Photojournalist.**

9.    Plaintiff Sharif Hassan is Arab-American. He was born in New Orleans, Louisiana and lived in the Atlanta-metro area for most of his life.

10.    Hassan is a published freelance photojournalist. He has worked as a photojournalist since age seventeen, having started his career shooting for outdoor sports publications.

3

11.    Hassan has worked professionally both domestically and internationally photographing races and other outdoor sports, as well as political and social-change events. The latter have included pro-democracy protests in Egypt during the 2010-2012 Arab Spring, and political protests in Atlanta, GA.

12.    Hassan's photographs have appeared in publications including the *Atlanta Journal-Constitution, Atlanta Magazine, The Mainline*, *Al Shorouk*, *National Geographic Adventure, Points North,* and *Bicycling Magazine*.

13.    Photography and photojournalism are currently Hassan's primary source of income.

14.    When working as a photojournalist, Hassan serves as a witness and recorder by documenting events without actively participating in them.

**City of Atlanta's Facially Invalid Curfew and Policy of Discriminatory Enforcement**

15.    On May 25, 2020, George Floyd was murdered by Minneapolis Police Officer Derek Chauvin, sparking national public outrage and instigating Black Lives Matter ("BLM") protests all across the country and the world.

16.    Beginning May 29, 2020, hundreds of people gathered in the City of Atlanta ("the City") to honor Floyd's life and to protest law enforcement's treatment of Black people in the United States.

4

17.    Over the course of the next week, 500 persons were arrested for participating in the Atlanta BLM protests, most on non-violent, misdemeanor allegations. Hundreds of those charges were later dismissed.

18.    On Friday, May 29, 2020, at or about 5:17 PM, then Atlanta Mayor Keisha Lance Bottoms issued and ordered enforcement of Executive Order 2020-92, which instituted a 9 PM-to-sunrise curfew for seventy-two (72) hours (i.e., until Monday, June 1, 2020), or until further extended.

19.    Mayor Bottoms was the final policymaker for the City of Atlanta regarding the issuance, scope, and enforcement of curfew orders. *See* Section 2-181(a) & (b) of the Code of the City of Atlanta.

20.    Executive Order 2020-92 had no explicit exception for members of the media engaged in newsgathering or for other First Amendment activity.[4]

21.    On or about May 30, 2020, the City of Atlanta adopted a policy ("the Policy"), approved by then Mayor Bottoms, of exempting some members of the media from Executive Order 2020-92 while they were working, but not others.

---

[4] Press rights organizations that monitored curfew orders during the Summer of 2020 "Black Lives Matter" protests described Atlanta's curfew as having no exception for the media. *See e.g., Reporters Committee Tracks Curfew Orders in Wake of Nationwide Protests,* REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (June 1, 2020), https://www.rcfp.org/protest-curfew-order-tracker/; *Need to Know: June 2, 2020,* AMERICAN PRESS INSTITUTE (June 2, 2020), https://www.americanpressinstitute.org/need-to-know/need-to-know-june-2-2020/.

Some of those select members of the media were informed in writing that they were considered exempt.

22.     Upon information and belief, the City had no organization or plan for identifying, exempting, and notifying members of the media who would be exempted from the curfew under the Policy.[5]

23.     On June 1, 2020 at 8:02 PM, then Mayor Bottoms issued and ordered enforcement of Executive Order 2020-94, which extended the 9 PM-to-sunrise curfew for another seventy-two (72) hours (i.e., until Thursday, June 4, 2020).

24.     Executive Order 2020-94 likewise contained no explicit exception for members of the media engaged in newsgathering or for other First Amendment activity.

25.     For the duration of Executive Order 2020-94, the City continued its discriminatory Policy of exempting some members of the media from its curfew while they were working, but enforcing the Executive Order as to other members of the media who were working.

**Plaintiff Arrested Per City's Discriminatory Policy**

26.     On June 1, 2020, Hassan had been photographing BLM protest and demonstration events around the City for much of the day.

---

[5] Stell Simonton, *A Week of Curfews in Atlanta Creates Plenty of Confusion*, ATLANTA MAGAZINE (June 8, 2020), https://www.atlantamagazine.com/news-culture-articles/a-week-of-curfews-in-atlanta-creates-plenty-of-confusion/.

27.    In the late afternoon to early evening, he arrived by bicycle at Atlanta's King Center for Nonviolent Social Change to photograph a protest march.

28.    Hassan walked with the protesters, pushing his bike.

29.    He was carrying his photography equipment, which consisted of a camera and a hip belt containing camera lenses.

30.    When the march reached the CNN Center, Hassan parked his bike and photographed the protestors and police officers present in front of the Center.

31.    Shortly before the onset of the City's 9:00 PM curfew, a line of APD officers began pushing the people who were in front of the CNN Center north on Centennial Olympic Park Drive ("Centennial").

32.    Behind the line of APD officers was an advancing line of National Guard, and behind the National Guard were two advancing tank-like vehicles with flashing blue lights.

33.    Hassan walked on Centennial behind the line of APD officers but in front of the line of National Guard.

34.    The street was blocked off to all vehicular traffic.

35.    Also walking behind the line of APD officers were other members of the media, including individuals carrying what appeared to be television camera equipment.

36.     Where Centennial intersects with a side street, a male individual wearing black pants and a red shirt ran down this side street.

37.     This individual was pursued by APD officers and taken to the ground.

38.     Hassan followed down the side street and began photographing this individual's arrest from a safe distance without interfering with the arrest in any way.

39.     There was no vehicular traffic allowed on this side street at this time.

40.     Hassan was not given any directions or orders to disperse before or at the time of his arrest.

41.     Seconds after Hassan began photographing the male individual's arrest, APD Officer Jane/John DOE No. 1, blocked Hassan's camera view, thus preventing his ability to photograph the arrest.

42.      DOE No. 1, along with APD Officer Jane/John DOE No. 2, then grabbed Hassan and made him lie face-down on the ground.

43.     These officers handcuffed Hassan with plastic zip ties, behind his back.

44.     Upon information and belief, either DOE No. 1 or DOE No. 2 was Defendant Francesca Barber, ID No. 6428, who later signed Hassan's City of Atlanta Arrest Citation, No. 2550538.

45.    Hassan was told he was being arrested for violating the City's curfew order.

46.    Hassan told DOES Nos. 1 and 2, one of whom is believed to be Defendant Barber, that he was a journalist and was there to take photographs.

47.    Hassan was holding his camera and was still wearing his hip belt containing his camera lenses.

48.    DOES Nos. 1 and 2, believed to include Defendant Barber, ignored Hassan, repeating that he was in violation of the City's curfew order.

49.    The officers failed to ask Hassan any follow-up questions about his statement that he was a working member of the media.

50.    Members of the media carrying television camera equipment who were present in the immediate vicinity of Hassan's arrest after the 9 PM curfew went into effect were not stopped or arrested by the police.

**Processing at CNN Center**

51.    Once under arrest and zip-tied, Hassan was taken to an outdoor processing area in front of the CNN Center.

52.    Tables and computers were set up for officers' use, and one or more buses were parked nearby for transporting arrestees.

53.    Hassan's camera and other property was taken from him by, upon information and belief, his arresting officers Defendants Barber and Jane/John

Does No. 1-2, including memory cards that were in Hassan's pocket containing some of his photographs of protests from earlier that week.

54.    Hassan was called up to a table, where an APD officer asked his name.

55.    The APD officer appeared to look up information about Hassan using a computer at the table.

56.    Hassan was given a mask to protect against COVID-19 and placed on a bus along with other curfew-related and protest-related arrestees.

57.    Hassan sat quietly on the bus for approximately an hour or two with his hands still zip-tied behind him.

**Booking and Overnight Detention: Hassan Treated Differently Than Other Arrestees**

58.    Eventually, Hassan and the other arrestees on the bus were driven to the Atlanta City Detention Center ("ACDC").

59.    ACDC is operated by the Atlanta Department of Corrections.

60.    The bus transporting Hassan arrived at ACDC around 11:00 PM.

61.    Hassan and the other arrestees on his bus were taken inside to a holding area.

62.    Hassan asked to make a phone call using the telephones in the holding area so that he could notify a friend or family member that he had been arrested.

63.    While Hassan had physical access to the telephones, he did not have the dial-out information necessary to place a call.

64.    Hassan asked an officer in the holding area for this information, but it was not provided.

65.    Hassan would ultimately ask three additional officers for the dial-out information, none of whom answered him.

66.    Being unable to make a phone call, Hassan grew increasingly concerned that none of his family or friends knew why he had not come home that night, or that he was in police custody.

67.    Meanwhile, other curfew-related and protest-related arrestees in the ACDC holding area were enabled to make phone calls.

68.    After a short time in the holding area, Hassan – who, upon information and belief, was the only arrestee of Arab race and ethnicity among the arrestees from his transport bus – was called out and taken to a separate room.

69.    There, Hassan was uncuffed and required to change out of his clothes and into a red or orange-colored jail jumpsuit.

70.    Hassan was then cuffed again with his hands in front of his body, this time using metal handcuffs.

71.    Hassan was taken by elevator to an upper level of ACDC.

72.    Other detainees on this upper level were loudly vocalizing their distress.

73.    Hassan was anxious and scared throughout the entirety of his arrest and detention, and these vocalizations further increased his worry about what would happen to him now that he was separated from the other arrestees with whom he had been transported to ACDC.

74.    Hassan was put into a cell on this upper level of ACDC, alone.

75.    Hassan, who is Muslim, was still handcuffed, which was painful and made it difficult for him to pray or sleep that night.

76.    Around 3 or 4 AM on June 2, 2020, an officer entered Hassan's cell and removed the handcuffs.

77.    Hassan was not given any food until around mid-day on June 2, 2020.

78.    Around 1:00 PM on June 2, 2020, Hassan was taken downstairs and placed in another holding cell with approximately four other individuals, some of whom were screaming or otherwise acting out.

79.    This, again, exacerbated Hassan's anxiety about his conditions of confinement and what would happen to him while in custody.

80.    Hassan was also concerned about being placed into a jail cell with other detainees during the COVID-19 pandemic where it was not possible to socially distance and not everyone was wearing a mask.[6]

81.    Hassan was subsequently moved into yet a different cell.

82.    Meanwhile, the other arrestees with whom Hassan had been brought to ACDC the night before were lined up, not inside a cell, waiting to be arraigned by a judge via video-conference.

83.    Unlike Hassan, these other arrestees were still wearing their own clothes and were not handcuffed.

84.    Hassan was taken out of his latest cell shortly before appearing before a judge via video-conference.

85.    A woman who Hassan recognized from the transport bus the night before asked him why he had been separated from the rest of the arrestees who had been brought to the ACDC together. She commented to Hassan that he had been one of the quietest people on the bus.

86.    Hassan had no answer, although in his own words, he was experiencing being treated like "a felon."

---

[6] *See* Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, WIRED (Mar. 24, 2020) https://www.wired.com/story/coronavirus-covid-19-jails-prisons/; Luke Barr, *70% of Inmates Tested Have COVID-19: Bureau of Prisons*, ABC NEWS (May 1, 2020, 2:49 PM), https://abcnews.go.com/US/70-inmates-tested-covid-19-bureau-prisons/story?id=70454527.

87.    Hassan several times asked officers at ACDC why he was being treated differently than the other arrestees with whom he had been brought to ACDC, but he received no answer or explanation.

88.    After appearing before a judge via video-conference, Hassan was taken back upstairs in ACDC and again placed in the cell where he had been held overnight.

89.    When Hassan looked out the window of this cell, he saw individuals who had been on the transport bus with him the night before. They were outside the detention center, eating and drinking, having already been released.

90.    Hassan was released from ACDC later in the day on June 2, 2020.

91.    He was released out the back entrance of ACDC.

92.    Right before he was released, Hassan was photographed and fingerprinted as he had not been formally booked prior to that point.

93.    Upon information and belief, Hassan was one of the last of the people arrested on June 1, 2020 for an alleged curfew violation to be released from ACDC on June 2, 2020.

94.    Upon information and belief, Mr. Hassan's differential treatment while in custody at ACDC was undertaken at the direction of and with the full knowledge and supervision of APD and Atlanta Department of Corrections (ADC) employees.

14

95.    Upon information and belief, Mr. Hassan's differential treatment while in custody at ACDC was because of his Arab race and ethnicity.

**Unlawful Seizure of Hassan's Property**

96.    Hassan's camera was not returned to him until the week following his June 2, 2020 release.

97.    Several of Hassan's camera memory cards taken from him at the time of his arrest were not returned at all.

98.    These memory cards included photographs from the preceding week of events, including a picture of protest fires in front of the CNN Center with people waving a "Black Lives Matter" flag.

99.    Upon information and belief, photographs of similar images sold for around $3,000.

100.    Hassan had intended to sell his confiscated photographs to news organizations or other publishers for monetary gain and professional advancement, and otherwise publicly disseminate them, had they not been unreasonably seized by his arresting officers Defendants Barber and Jane/John Does No. 1-2.

**Continuing Malicious Prosecution from June 1, 2020 Until Charge Dismissed on January 13, 2021**

101.    Then Mayor Bottoms had authorized the following interpretation of the City's curfew, as noted in an email from Amber Robinson in the City Law Department to Deputy City Attorney Kimberly Patrick (italics in the original):

She [Mayor Bottoms] has authorized the following guidance concerning the enforcement of the curfew order:

*The City of Atlanta has imposed a curfew again this evening to begin at 9 p.m. Atlanta Police officers will be enforcing the curfew. It is important to note that people who are traveling to and from work, or are engaged in work activities, are not subject to arrest.*

Members of the media who are engaged in work activities are therefore not subject to arrest under the curfew order.

102.    On June 3, 2020, the City made social media announcements to clarify that curfew "[e]xceptions apply to people seeking medical help, *working,* first responders, & homeless. Call @ATL311 for details" (emphasis added).[7]

103.    The curfew exceptions identified in Amber Robinson's email and in the City's June 3, 2020 social media announcement applied to photojournalist Sharif Hassan, who was arrested while filming police engaged in official activity in a public place.

104.    Instead of dropping the curfew violation charge, however, the City continued to prosecute Hassan for more than six months in Atlanta Municipal Court.

---

[7] *City of Atlanta Extends Curfew for Rest of the Week, Earlier Start for Weekend*, 95.5 WSB Radio (June 3, 2020) (includes City of Atlanta's social media announcement), available at: https://www.wsbradio.com/news/local/city-atlanta-extends-nightly-curfew-for-rest-week-earlier-start-for-weekend/8w9lmgtNwA8Y9DnPDJAIGM/.

105.   During this time, Hassan could not travel freely either nationally or internationally, including for work, because of the need to be able to appear in court when noticed.

106.   Hassan was required to appear in Atlanta Municipal Court three times: on September 16, 2020; December 3, 2020; and January 13, 2021.

107.   Finally, on January 13, 2021, after Hassan's criminal defense counsel filed a motion to dismiss/demurrer premised on his free speech and press rights as a journalist, and identifying the City's Policy of exempting some members of the media from the then Mayor's curfew while they were working, but not others, the prosecutor dropped the charge against him due to what were termed "evidentiary reasons."

**Chilling Effects of Hassan's Unlawful Arrest, Detention, and Prosecution**

108.   Hassan's arrest, detention, and prosecution have chilled him from documenting political protest events due to concern that he will again be wrongfully arrested and that the resulting criminal charge will impede his ability to travel within and outside of the United States, including for work.

109.   Hassan did not photograph another political protest event until almost a year after his arrest, and even then, he had a heightened sense of fear and anxiety about being arrested.

110.    Hassan feels it is safest for him to limit his photojournalism to corporate or sporting events in order to avoid future arrest.

111.    This limitation has had both a personal and professional cost. It has impeded Hassan's ability to photograph and document political and social justice events for work, and has also prevented him from volunteering his documentary support for friends who are organizers or activists in such events.

**City of Atlanta Failed to Comply with Open Records Requests**

112.    Pursuant to the Georgia Open Records Act (ORA), O.C.G.A § 50-18-70, *et seq.*, on February 23, 2021, counsel for Mr. Hassan submitted an Open Records Request to the City of Atlanta's Law Department asking for all departmental policies, orders, operating procedures, memos, other documents, or communications regarding: the implementation of any and all 2020 executive orders by the Mayor of Atlanta establishing a city-wide curfew; any exemptions or exceptions to 2020 curfews generally and any specific exemption for members of the media; and any law enforcement investigations, detentions, or arrests of members of the media between the dates of May 29, 2020 and June 8, 2020.

113.    Hassan's counsel contacted the Law Department via email and phone on March 2, March 18, and March 23, 2021, but received no response.

114.   After finally making phone contact with the Law Department on
March 25, 2021, counsel was informed that Ms. Amber Robinson was the
appropriate person to whom to direct ORA requests.

115.   The above request was re-sent to Ms. Robinson on April 2, 2021.

116.   On April 5, Ms. Robinson, responded: "The City of Atlanta
Department of Law is the custodian of records responsive to your requests,
however *all such records are exempt from production pursuant to the
attorney/client privilege* in accordance with the Georgia Open Records Act at
OCGA 50-18-72(a) (41)." (Emphasis added.)

117.   Despite the Georgia legislature's finding "that public access to public
records should be encouraged to foster confidence in government," O.C.G.A. § 50-
18-72(a), the City, via Ms. Robinson, improperly asserted an inapplicable and
blanket privilege to deny access to public documents.

118.   Accordingly, Hassan was denied records relevant to his own arrest
and prosecution in violation of Georgia's Open Records Act.

**CLAIMS FOR RELIEF**

**<u>Count I</u>**
**_Violation of Plaintiff's First Amendment Rights - Executive Orders 2020-92 and
2020-94 - Facial Challenge_**
*(Against City of Atlanta)*

119.   Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 93,
and 101 through 111 as if fully set forth herein.

19

120.    Government regulation of First Amendment-protected activity in public fora like city streets and sidewalks must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Gold Coast Pub'ns v. Corrigan*, 42 F.3d 1336, 1344 (11th Cir. 1994); *Coffey v. Fayette Cty.*, 280 Ga. 656, 657 (2006). Even a "content-neutral limitation on the time, place, or manner" of protected First Amendment activity "must (1) be narrowly tailored to serve a significant government interest; and (2) provide ample alternative channels of communication." *Gold Coast Publ'ns*, F.3d at 1344.

121.    Assuming Executive Orders 2020-92 and 2020-94 (collectively, hereinafter, "Atlanta Curfew Orders") served the significant governmental interests of promoting public safety and preventing violence or property damage, they were not "narrowly tailored" because on their face, they prevented all persons, regardless of their purpose or activity, including here working reporters, from being present on public streets or sidewalks, and exempted only individuals traveling through the City by vehicle.

122.    The Atlanta Curfew Orders as written and enforced on the Mayor's authority failed to leave open "ample alternative channels" for communication by the press. Without an exception for the media to engage in its most basic newsgathering function between the hours of 9 PM and sunrise on May 29, 2020 through June 4, 2020, Hassan and other members of the media were deprived of

their press freedoms while the public lost its eyes and ears on events of significant importance, including after-curfew interactions between civilians and Atlanta City police.

123.   While it is an open question as to the proper standard for evaluating a First Amendment free-speech challenge to an emergency executive order,[8] even under the most deferential standard possible the Atlanta Curfew Orders fail to survive constitutional scrutiny. That deferential standard requires (1) "a determination [of] whether the executive's actions were taken in good faith, and (2) whether there is some factual basis for the decision that the restrictions … imposed were necessary to maintain order." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

124.   Plaintiff does not challenge the good faith of the Atlanta Curfew Orders which, respectively, imposed a 9 PM-to-sunrise curfew for 72 hours and then extended the curfew for another 72 hours. However, there was no factual basis supporting the decision to include even First Amendment-protected newsgathering within the facial scope of the Atlanta Curfew Orders as necessary to maintain order. Put another way, there was no factual basis supporting the failure to

---

[8] *See Tinius v. Choi*, No. CV 21-0907 (ABJ), 2022 WL 899238 (D.D.C. Mar. 28, 2022); *Larson v. City of Minneapolis,* 568 F. Supp. 3d 997 (D. Minn. 2021).

explicitly exempt protected newsgathering from the Atlanta Curfew Orders as necessary to maintain order.

125.   Indeed, without any factual basis for doing so, the Atlanta Curfew Orders created a 6-day media black-out between 9 PM and sunrise in the public streets of Atlanta during a time of heightened public interest and police activity -- i.e., the historic George Floyd/BLM protests of Summer 2020 that coincided with a once-every-hundred-years pandemic (COVID-19).

126.   The City of Atlanta essentially conceded the lack of a factual basis for including newsgathering in the facial scope of its Curfew Orders when it attempted to clarify through social media announcements that the curfew would not apply to "people seeking medical help, *working*, first responders, & homeless" (emphasis added).

127.   In contrast, other municipalities around the country that instituted emergency curfews in response to George Floyd/BLM protests and the COVID-19 pandemic included in the text of their curfew orders explicit exemptions for working members of the media.[9]

128.   Indeed, municipalities seeking to promote public safety and prevent violence and property damage have long made exemptions for the press, even when otherwise enacting significant restrictions on First Amendment activity. *See*

[9] *See* FN4, above.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1125 & n.16 (9th Cir. 2005) (city included a media carveout for "restricted area" of downtown during violent protests).

129.   By failing to explicitly exclude basic newsgathering from the facial scope of the Atlanta Curfew Orders, the City, without factual basis, deprived Hassan and other working members of the media of their First Amendment press freedoms while the public lost its eyes and ears on events of significant importance, including after-curfew interactions between civilians and the Atlanta Police Department.

130.   The Atlanta Curfew Orders were therefore overbroad on their face because the City and then Mayor lacked any factual basis for not explicitly excluding working members of the media.

131.   Accordingly, the Atlanta Curfew Orders were facially invalid, rendering Hassan's arrest pursuant thereto unlawful.

## Count II
***Violation of Plaintiff's First Amendment and Fourteenth Amendment Free Press and Equal Protection Rights –
Executive Orders 2020-92 & 2020-94 - As Applied Challenge***
*(Against City of Atlanta)*

132.   Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 93, and 101 through 111 as if fully set forth herein.

133.    The City of Atlanta had a Policy, approved by then Mayor Keisha Lance Bottoms, of exempting some members of the media from the May 29, 2020 Executive Order 2020-92 (9 PM-to-sunrise curfew) while they were working, but not others.

134.    When then Mayor Bottoms issued Executive Order 2020-94 at 8 PM on June 1, 2020, extending the 9 PM-to-sunrise curfew for another seventy-two (72) hours until June 4, 2020, the City, on the Mayor's authority, continued its Policy of exempting some members of the media but not others.

135.    This was evidenced by the fact that some members of the media who were out on the streets and sidewalks after 9 PM on June 1, 2020 in the immediate vicinity of Hassan were not arrested, while Hassan was.

136.    Hassan's arrest pursuant to the City's Policy of discriminatory curfew enforcement was unlawful because the First Amendment prohibits governments from restricting the rights of some journalists while affording access to others.

137.    "Once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Am. Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977); *United Teachers of Dade v. Stierheim*, 213 F.Supp.2d 1368, 1373–74 (S.D. Fla.

2002); *Cable News Network, Inc. v. American Broadcasting Companies, Inc.*, 518
F.Supp. 1238, 1245 (N.D. Ga. 1981).

138.   Hassan also faced unequal treatment compared to his fellow members

of the news media when, pursuant to the City's discriminatory Policy, other news

outlets were left alone to continue their newsgathering after 9 PM on June 1, 2020,

but Hassan was arrested, notwithstanding that he was engaged in the same activity.

This violated Hassan's right to equal protection. *See ABC*, 570 F.2d at 1084;

*Nicholas v. Bratton*, 376 F.Supp.3d 232, 250, 259, 288 (S.D.N.Y. 2019).

139.   Hassan's arrest for a curfew violation, while other members of the

media were allowed to continue working in the same immediate vicinity as Hassan

after 9 PM on June 1, 2020, was unlawful under both the First Amendment and the

Fourteenth Amendment's Equal Protection Clause.

### Count III
***Violation of Plaintiff's First Amendment Rights - Interference with and
Retaliation for Exercising Right to Record***
*(Against Barber and DOES Nos. 1 & 2 in their individual capacities)*

140.   Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 93,

and 101 through 111 as if fully set forth herein.

141.   Hassan has a First Amendment right to photograph and film police

officers carrying out their official duties in public, without police interference. *See*

*Smith v. City of Cumming,* 212 F.3d 1332, 1333 (11th Cir. 2000); *Bowens v.*

*Superintendent of Miami South Beach Police Dept.*, 557 Fed. Appx. 857, 863 (11th Cir. 2014).

142.    Atlanta Police Department Standard Operating Procedures prohibit all employees from interfering with a citizen's right to record police activity by photographic, video, or audio means, as long as the recording by the citizen does not physically interfere with the performance of an officer's duties. APD SOP Sec. 4.4.1 (1).

143.    Hassan was photographing a citizen's arrest from a safe distance away, without interfering with police activity in any way, when he was arrested.

144.    Hassan was not given orders or directions to disperse before being arrested.

145.    Hassan was not posing a safety or health threat at the time of his arrest.

146.    Hassan was not subject to police interference with his filming or arrested for an alleged curfew violation until he began photographing the APD's arrest of another individual.

147.    The interference with Hassan's photographing and his ultimate arrest were triggered by, and in retaliation for, his protected activity of photographing public police activity, and therefore violated the First Amendment.

## Count IV

***Violation of Plaintiff's Fourth Amendment Rights: Unlawful Seizure of Property***
*(Against Barber and DOES Nos. 1 and 2 in their individual capacities)*

148.   Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 100 as if fully set forth herein.

149.   At the time of his June 1, 2020 arrest, Defendants seized Hassan's work product, consisting of his camera, the memory card inside it, and several memory cards he was carrying in his pocket containing photographs of events in Atlanta earlier that week.

150.   The memory cards taken from Hassan's pocket were never returned to him when he received the rest of his property back.

151.   Defendants seized the unreturned camera memory cards without securing a warrant.

152.   Defendants had no probable cause to continue holding Hassan's memory cards after he was released from custody, and Defendants had returned the rest of his property.

153.   Defendants' failure to return Hassan's camera memory cards upon the release of the rest of his property was an unreasonable seizure of journalist equipment and work product. *See Thompson v. City of Clio*, 765 F. Supp. 1066, 1073 (M.D. Ala. 1991).

154.   The unreturned camera memory cards, which contained photographs from prior to the time of Hassan's arrest, had no bearing on the charge levied against Hassan for an alleged curfew violation, nor any other criminal offense.

155.   Hassan was planning to sell, publish, and disseminate to the public the photos contained on the unreturned memory cards for monetary gain and professional advancement.

156.   Upon information and belief, photographs similar to some of Hassan's photographs that were lost due to the unreturned memory cards sold for around $3,000.

157.   Defendants' seizure of Hassan's property interfered with his main source of income and deprived him of the opportunity to further enhance his professional visibility as a photojournalist.

158.   The seizure of Hassan's property also deprived members of the public of images of newsworthy and significant events.

159.   The actions of Defendants were the proximate cause of the unreasonable seizure of Hassan's memory cards and the damages arising therefrom.

## Count V
### Violation of Plaintiff's Rights under the Federal Privacy Protection Act, 42 U.S.C. § 2000aa, et seq.
*(Against Barber and DOES Nos. 1 and 2 in their individual capacities)*

160.    Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 100, and 148 through 159 as if fully set forth herein.

161.    Defendants' seizure of Hassan's camera memory cards without a warrant or probable cause prevented him from selling or publishing his work product.

162.    This deprivation caused Mr. Hassan economic damages and lost opportunity to advance his professional visibility and profile.

163.    Defendants are liable under 42 U.S.C. § 2000aa for Hassan's actual damages and liquidated damages of not less than $3,000 plus attorneys' fees and costs.

## Count VI
### Unlawful Seizure, False Arrest, and Malicious Prosecution under Fourth Amendment
*(Against City of Atlanta, Barber and DOES Nos. 1 and 2 in their individual capacities)*

164.    Plaintiff Sharif Hassan repeats and realleges paragraphs 1 through 93, and 101 through 111 hereof, as if fully set forth herein.

165.    On June 1, 2020, Hassan was arrested and charged with a curfew violation pursuant to the City of Atlanta's facially invalid Curfew Orders and

29

discriminatory Policy of exempting some working members of the media from its curfew, but not others.

166.    Both the City's Curfew Orders and its discriminatory Policy were enforced on the authority of then Atlanta Mayor Keisha Lance Bottoms.

167.    Hassan was arrested while working as a photojournalist and a member of the media.

168.    Hassan informed his arresting officers Jane/John DOES Nos. 1 & 2, one of whom is believed to have been Defendant Francesca Barber, that he was a photojournalist there to take pictures, but they ignored him.

169.    Then Atlanta Mayor Keisha Lance Bottoms, who was the final policy maker with respect to the issuance and enforcement of the Atlanta Curfew Orders, authorized that: "Members of the media who are engaged in work activities are therefore not subject to arrest under the curfew order."

170.    This is memorialized in an email from City Law Department employee Amber Robinson to Deputy City Attorney Kimberly Patrick.

171.    On June 3, 2020, the City made social media announcements to clarify that curfew "[e]xceptions apply to people seeking medical help, *working,* first responders, & homeless. Call @ATL311 for details."

172.    There was no probable cause, or even arguable probable cause, for the City to enforce its Curfew Orders against Hassan by arresting him and thereafter

continuing to press a curfew-violation charge against him when he had been working as a photojournalist when he was arrested.

173.   Nonetheless, the City continued to prosecute Hassan for a curfew violation for more than six months.

174.   Only on January 13, 2021, after Hassan's counsel filed a demurrer/motion to dismiss identifying the City's discriminatory Policy of exempting some members of the media from the Curfew Orders but not others and asserting Hassan's First Amendment and Equal Protection rights as a member of the press, was the curfew-violation charge against him dismissed by the prosecutor, terminating the prosecution in Hassan's favor.

175.   Defendants displayed both malice and reckless disregard for Hassan's constitutional rights in arresting and continuing to prosecute him for more than six months without probable cause, or even arguable probable cause.

176.   Defendants' actions were the proximate cause of Hassan's malicious prosecution and arrest, and the damages arising therefrom.

### Count VII
### *Violation of Plaintiff's Rights under Georgia's Open Records Act, O.C.G.A. § 50-18-70, et seq.*
### *(Against City of Atlanta)*

177.   Plaintiff Sharif Hassan repeats and realleges paragraphs 112 through 118 as if fully set forth herein.

31

178.   Under the Georgia Open Records Act ("ORA"), agencies shall produce for inspection all records responsive to a request within three business days of receipt of a request or as soon thereafter "as practicable." O.C.G.A. § 50-18-71(b)(1)(A).

179.   On February 23, 2021, counsel for Hassan submitted an Open Records Request to the City of Atlanta Law Department asking for all departmental policies, orders, operating procedures, memos, other documents, or communications regarding: the implementation of any and all 2020 executive orders by the Mayor of Atlanta establishing a city-wide curfew; any exemptions or exceptions to 2020 curfews generally, and any specific exemption for members of the media; and any law enforcement investigations, detentions, or arrests of members of the media between the dates of May 29, 2020 and June 8, 2020.

180.   Despite multiple attempts to follow up, counsel did not receive a response until April 5, 2021 when Law Department representative Amber Robinson wrote: "The City of Atlanta Department of Law is the custodian of records responsive to your requests, however *all such records are exempt from production pursuant to the attorney/client privilege* in accordance with the Georgia Open Records Act at OCGA 50-18-72(a)(41)." (Emphasis added).

181.   Ms. Robinson improperly asserted a blanket privilege with respect to "all" responsive records.

182.    The records request, on its face, seeks documents that would not reasonably fall within the scope of attorney-client privilege – *e.g.*, policies, orders, and operating procedures regarding enforcement of the curfew, and law enforcement investigations, detentions, or arrests of members of the media.

183.    Even if some of the responsive records possessed by the Law Department were protected by attorney-client privilege, the City had waived its privilege by already sharing with third parties certain documents that are clearly responsive to Hassan's counsel's Open Records request. This included the June 2, 2020 email between City Law Department representative Amber Robinson and Deputy City Attorney Kimberly Patrick memorializing the Mayor's guidance for enforcing the City's curfew.

184.    The City of Atlanta's Law Department violated ORA by failing to timely produce requested records and improperly citing an inapplicable privilege in an attempt to justify their withholding.

185.    Hassan seeks declaratory and injunctive relief requiring the City to provide Hassan with access to the requested records and barring the City from continued violations of the ORA.

186.    Hassan also seeks civil penalties and attorneys' fees for the Law Department's non-compliance under the ORA. O.C.G.A. §§ 50-18-73(b) & 50-18-74(a).

## REQUEST FOR RELIEF

WHEREFORE, on the basis of the foregoing, Plaintiff Sharif Hassan respectfully

prays that this Court:

a) Assume jurisdiction over this action;

b) Hold a trial by jury on all issues so triable;

c) Award nominal, compensatory, presumed and other damages to Plaintiff in amount determined by the enlightened conscience of fair and impartial jurors;

d) Award punitive damages against APD Officers Francesca Barber and Jane/John Does Nos. 1 & 2;

e) Award declaratory and injunctive relief as set out herein;

f) Award actual damages of not less than $3,000 for the Defendants' violation of 42 U.S.C. § 12000aa;

g) Award civil penalties under the Georgia Open Records Act, *see* O.C.G.A. § 50-18-74(a);

h) Award reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000aa-6(f), O.C.G.A. § 50-18-73, and other applicable law; and

i) Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 19th day of July, 2022.

/s/ Gerald Weber
Gerald Weber
Georgia Bar No. 744878
wgerryweber@gmail.com
LAW OFFICES OF
GERRY WEBER, LLC
Post Office Box 5391
Atlanta, Georgia 31107
(404) 522-0507 (phone)

/s/ Clare Norins
Clare Norins
Georgia Bar No. 575364
cnorins@uga.edu
FIRST AMENDMENT CLINIC[10]
University of Georgia
School of Law
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419 (phone)

/s/ L. Burton Finlayson
L. Burton Finlayson
Georgia Bar Number: 261460
lbfcourts@aol.com
LAW OFFICE OF
L. BURTON FINLAYSON, LLC
931 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
(404) 872-0560 (phone)

*Attorneys for Plaintiff Sharif Hassan*

---

[10] Thank you for the contributions of First Amendment Clinic students Amy Morgia, Catherine Freeman, Daniel Zimmer, Julia Griffis, legal fellow Samantha Hamilton, and legal intern Marlene Berroa Rodriguez.

## CERTIFICATE OF SERVICE AND COMPLIANCE

I certify that on July 19, 2022, I filed and served the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record. I also certify this date that the foregoing was prepared in accordance with N.D. Ga. L.R. 5.1, using Times New Roman font, 14 point.

*/s/ Clare R. Norins*
Clare R. Norins
Georgia Bar No. 575364